RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0183p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

TREVOR J. SCHLEICHER,

*Plaintiff-Appellant,*

v.

No. 15-1716

PREFERRED SOLUTIONS, INC.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-10729—Paul D. Borman, District Judge.

Argued: March 9, 2016

Decided and Filed: August 2, 2016

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Elisabeth A. Gusfa, STERLING ATTORNEYS AT LAW, P.C., Bloomfield Hills, Michigan, for Appellant. David M. Cessante, CLARK HILL PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Elisabeth A. Gusfa, Raymond J. Sterling, James C. Baker, STERLING ATTORNEYS AT LAW, P.C., Bloomfield Hills, Michigan, for Appellant. David M. Cessante, Ellen E. Hoeppner, CLARK HILL PLC, Detroit, Michigan, for Appellee.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. Between 2009 and 2013, Trevor Schleicher worked for Preferred Solutions, Inc. ("Preferred"), a Michigan-based company that provides staffing for corporate clients. With his co-worker Susan Piotrowski, Schleicher led Preferred's

1

healthcare information technology staffing group. Schleicher and Piotrowski performed the same job, had the same responsibilities, and each earned a share of the profits they collectively generated. However, they asked Preferred's CEO, Marie Seipenko, to be paid pursuant to different compensation models: Schleicher received 20% of the group's profit pool, while Piotrowski received a $100,000 base salary plus a 10% draw from the profit pool. This worked out well for Schleicher: between 2009 and 2013, he outearned Piotrowski by $694,159.38. However, he also had a number of disagreements with Seipenko and other Preferred employees. In 2013, Seipenko modified Schleicher's compensation model so that it matched Piotrowski's. From that point onward, he received a $100,000 salary and 10% of the profit pool. At the end of that year, Seipenko terminated Schleicher.

Schleicher sued Preferred under the Equal Pay Act ("EPA"), alleging that Preferred violated the statute by paying him more than Piotrowski for three years, then lowering his compensation so that it matched Piotrowski's. The district court granted summary judgment to Preferred, finding that it had conclusively established that sex played no part in the pay differential between Schleicher and Piotrowski. For the reasons set forth below, we AFFIRM the district court's entry of summary judgment in favor of Preferred.

## I. FACTS AND PROCEDURE

### A. Facts

#### 1. Seipenko hires Piotrowski and her former co-worker Schleicher.

Preferred is a Michigan-based company that provides staffing services for corporate clients. R. 39-5 (Company Highlights/History at 1) (Page ID #537). John Butkovich founded Preferred in 1993. R. 39-2 (Seipenko Dep. at 6:24–7:10) (Page ID #385). He now sits on the company's board of directors; his daughter, Seipenko, has been Preferred's President and CEO since 2002. *Id.* at 8:1–9:15 (Page ID #386).

In December 2006, Seipenko hired Piotrowski, who came onboard as a vice president. R. 39-3 (Piotrowski Dep. at 20:7–11) (Page ID #456). Around January 2007, Piotrowski introduced Seipenko to Schleicher, her former co-worker. R. 39-2 (Seipenko Dep. at 23:6–10) (Page ID

#389); R. 39-3 (Piotrowski Dep. at 19:4–6) (Page ID #456). Piotrowski told Seipenko that Schleicher had done well "selling healthcare IT staffing services." R. 39-3 (Piotrowski Dep. at 19:23–20:1) (Page ID #456). Seipenko and Schleicher had a lunch meeting in January 2007, where they discussed Schleicher's work in general terms. R. 39-2 (Seipenko Dep. at 22:7–23:8) (Page ID #389).

Until 2008, Preferred was "a general IT staffing company." R. 39-2 (Seipenko Dep. at 11:13–22) (Page ID #386). Seipenko had tried (unsuccessfully) to move Preferred into several niche markets. *Id.* at 11:20–12:7) (Page ID #386). Around April 2008, Seipenko decided to move Preferred into a new niche: healthcare information technology, and "specifically training in go-live business for electronic medical records." *Id.* at 18:3–7 (Page ID #388). The parties dispute what role Schleicher played in Preferred's decision to pursue this line of business. R. 51 (5/18/15 Op. and Order at 3–4) (Page ID #1298–99).

In 2009, Seipenko hired Schleicher and one of his co-workers, Katrina Purdy. R. 51 (5/18/15 Op. and Order at 4) (Page ID #1299). Schleicher worked directly with Piotrowski: Seipenko wanted them to "co-sell[] and co-lead[] activities and growth targeted at the health information technology space." R. 39-3 (Piotrowski Dep. at 49:5–10) (Page ID #464). Schleicher and Piotrowski were Preferred's only salespeople specializing in this health IT market. R. 39-7 (Schleicher Dep. at 73:18–21) (Page ID #579). Both "perform[ed] the same job" at Preferred. R. 39-3 (Seipenko Dep. at 70:3–9) (Page ID #401).

**2. Schleicher and Piotrowski select different compensation models.**

When she first joined Preferred, Piotrowski received a $120,000 annual salary, plus a 10% commission rate. R. 39-3 (Piotrowski Dep. at 46:3–10) (Page ID #463). Piotrowski's commissions were measured as the "gross profit that [she] produced in [her] business unit." *Id.* at 46:8–10 (Page ID #463). Sometime thereafter—but before Schleicher joined Preferred— Piotrowski elected to switch to a different compensation model: a $100,000 salary plus 20% commissions. R. 39-2 (Seipenko Dep. at 77:9–78:1) (Page ID #403); R. 39-3 (Piotrowski Dep. at 46:12–15) (Page ID #463).

When Schleicher joined Preferred, he negotiated with Seipenko to create a new compensation model that differed from Piotrowski's in two respects. R. 39-2 (Seipenko Dep. at 69:7–12) (Page ID #401). First, Schleicher wanted to be paid directly from a profit pool, instead of earning income on a commissions basis. *Id.*; R. 39-7 (Schleicher Dep. at 75:2–77:17) (Page ID #579–80). The pool would consist of the "collective gross profit produced by [Schleicher] and [Piotrowski], less direct costs for conducting the business." R. 39-3 (Piotrowski Dep. at 47:8–11) (Page ID #463). Pursuant to the profit-pool model, Schleicher would receive a set draw of the profits that he and Piotrowski collectively generated in their healthcare IT sales unit, "regardless of what an individual did in any particular quarter." R. 39-7 (Schleicher Dep. at 80:1–81:13) (Page ID #580–81); R. 51 (5/18/15 Op. and Order at 6–7) (Page ID #1301–02). Second, Schleicher wanted to be paid *exclusively* from the profit pool, with no salary. *Id.* at 76:14–77:4 (Page ID #579–80). Schleicher and Seipenko settled on the following model: Schleicher would receive 20% of the profit pool "with no guaranteed base salary." R. 51 (5/18/15 Op. and Order at 7) (Page ID #1302).

Because Seipenko agreed to Schleicher's profit-pool proposal—and because the profit pool would consist of profits generated exclusively by Schleicher and Piotrowski—Seipenko modified Piotrowski's compensation model. R. 39-3 (Piotrowski Dep. at 46:24–47:5 (Page ID #463). Seipenko offered Piotrowski the same compensation model that Schleicher had negotiated. R. 39-2 (Seipenko Dep. at 237:22–25) (Page ID #443). Piotrowski declined, opting instead for a $100,000 base salary plus a 10% draw from the profit pool. *Id.* at 78:2–5, 238:1–2) (Page ID #403, 443); R. 39-3 (Piotrowski Dep. at 47:1–7, 140:23–141:6) (Page ID #463, 486–87). Schleicher "talked openly with" Piotrowski about his profit-pool-only compensation model; by his account, Piotrowski "wouldn't touch it with a 10-foot pole" because it was risky. R. 39-7 (Schleicher Dep. at 81:11–17) (Page ID #581).

At the time Schleicher and Piotrowski negotiated these different deals, Seipenko did not "have any idea" which of them would end up making more money. R. 39-2 (Seipenko Dep. at 238:3–17) (Page ID #443). Neither party disputes that Schleicher made considerably more than Piotrowski: between 2009 and 2013, Schleicher outearned her by $694,159.38. R. 43-10 (Earnings Chart) (Page ID #895). However, at no point during Schleicher's tenure at Preferred

did Piotrowski complain to Seipenko or ask to change her compensation model.   R. 39-3 (Seipenko Dep. at 120:18–121:16) (Page ID #481–82).

### 3.  Seipenko modifies Schleicher's compensation model after he has several problems at Preferred.

Preferred's healthcare IT staffing group did well after Schleicher joined the company. The group generated $892,940.22 in revenue in the fourth quarter of 2009; in the following years, the group brought in $13.1 million (2011), $16.6 million (2012), and $11.4 million (2013). R. 51 (5/18/15 Op. and Order at 8) (Page ID #1303).

Schleicher, however, had problems with a number of different people at Preferred. Although the parties dispute many of the details, R. 51 (5/18/15 Op. and Order at 9–10) (Page ID #1304–05), Schleicher sent Seipenko two emails in which he acknowledged these issues.  In the first, sent on October 8, 2012, Schleicher wrote:

> First, I want to tell you again that I feel terrible that I'm at the root of any problems for you or anyone else in the company.  It sickens me to be tied to anything negative relative to my efforts here at Preferred.  I'm 100% committed to getting back on the same page again with you, am wide open to constructive criticism, will be accountable for my actions, and will work very hard to be a better employee, person, and colleague!

R. 39-10 (10/8/12 Email from Schleicher to Seipenko) (Page ID #657).   Shortly thereafter, Schleicher and Seipenko got into a major dispute over a project scheduled to take place at one of Preferred's New Jersey-based clients right around the time of Hurricane Sandy.   R. 39-2 (Seipenko Dep. at 204:13–209:25) (Page ID #435–36); R. 51 (5/18/15 Op. and Order at 10–11) (Page ID #1306).   Although the parties dispute the sequence of events, Schleicher evidently disobeyed several direct orders from Seipenko.   R. 51 (5/18/15 Op. and Order at 10–11) (Page ID #1305–06).   That incident prompted another email from Schleicher:

> I could have never predicted or imagined when I decided to come work for you how much resistance I would get from you every step of the way.
>
> . . . .

> . . . I have given you everything I have with nothing but the best intentions at heart.  I do not believe there is a justifiable reason to let me go and I hope that is not what you want to do.

R. 39-12 (10/30/12 Email from Schleicher to Seipenko at 1–2) (Page ID #661–62).

The parties also dispute Schleicher's sales performance.  R. 51 (5/18/15 Op. and Order at 8–9) (Page ID #1304).  Seipenko recalls that Schleicher's co-workers complained that Schleicher "was not pulling his weight in sales," and that Schleicher told Seipenko that Piotrowski should shoulder more sales responsibility.  R. 39-2 (Seipenko Dep. at 107:16–18, 137:20–138:5) (Page ID #410, 418).  Schleicher counters that his performance was not deficient; further, he claims that Seipenko made several derogatory, gender-based remarks to him during his time at Preferred (e.g., "[Y]ou might be better suited in an office with more men").  R. 39-7 (Schleicher Dep. at 253:22–255:21) (Page ID #624).

On May 3, 2013, Seipenko told Schleicher that she was changing his compensation plan: from that point forward, his compensation would be calculated similar to that of Piotrowski ($100,000 salary plus 10% of the profit pool).  R. 39-2 (Seipenko Dep. at 92:19–23) (Page ID #406).  By Seipenko's account, she changed Schleicher's pay structure "to motivate him to sell." *Id.* at 94:19–22 (Page ID #407).  Schleicher recalls that, during this May 3 meeting, Seipenko "told [him] that she was not happy that [he] made more money than" Piotrowski and that she wanted to "equalize" their compensation.  R. 39-7 (Schleicher Dep. at 226:20–227:3) (Page ID #617).

### 4.  Seipenko terminates Schleicher.

The discord between Schleicher and Seipenko grew in 2013.  R. 51 (5/18/15 Op. and Order at 13) (Page ID #1308).  On December 2, 2013—after Schleicher evidently disobeyed a direct order from Seipenko regarding his supervision of a Preferred employee—Seipenko terminated Schleicher. *Id.* at 14 (Page ID #1309).

**B.  Procedural History**

On February 17, 2014, Schleicher filed a four-count complaint against Preferred, alleging that:

1.  Preferred had violated the EPA;

2.  Preferred had violated Michigan's Elliott-Larsen Civil Rights Act;

3.  Preferred had breached its employment contract with Schleicher; and

4.  Preferred was unjustly enriched as a result of Schleicher's work at Preferred.

R. 1 (Compl. at 6–10) (Page ID #6–10).  Preferred moved for summary judgment on all four of Schleicher's claims on January 23, 2015.  R. 39 (Def.'s Mot. for Summ. J.) (Page ID #343).  Schleicher responded on February 13, 2015.  R. 43 (Pltf.'s Br. in Opp. to Def.'s Mot. for Summ. J.) (Page ID #762).

On May 18, 2015, the district court issued an order (1) granting Preferred's motion for summary judgment on Schleicher's EPA claim and (2) declining to exercise supplemental jurisdiction over Schleicher's state-law claims.  R. 51 (5/18/15 Op. and Order at 1) (Page ID #1296).  Because the district court reasoned that Preferred had "acquiesce[d] that Plaintiff ha[d] established a prima facie case under the EPA," it focused on whether Preferred had rebutted that case with an affirmative defense.  R. 51 (5/18/15 Op. and Order at 19) (Page ID #1314).  It concluded that "Piotrowski's compensation differential was based on a factor other than sex— namely personal choice regarding the risk associated with the compensation structure."  *Id.* at 21 (Page ID #1316).  Finding no genuine dispute of material fact "that sex provided no reason for" this differential, the district court dismissed Schleicher's EPA claim with prejudice.  *Id.* at 23–24 (Page ID #1318–19).

Schleicher timely appealed the district court's grant of summary judgment in favor of Preferred on his EPA claim, but not its dismissal of his state-law claims.  R. 59 (Notice of Appeal at 1–2) (Page ID #1346–47).

## II. ANALYSIS

### A. Standard of Review

We review a district court's grant of summary judgment de novo. *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015). "Summary judgment is appropriate if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact for trial." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015).

### B. Schleicher's EPA Claim

"The EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). Schleicher makes a two-part EPA argument. First, he claims that Preferred violated the EPA by "*maintaining* the pay disparity" between Schleicher and Piotrowski for more than three years. Appellant Br. at 21. Second, he argues that Preferred violated the EPA again when it tried to cure this pay disparity by lowering Schleicher's compensation to match Piotrowski's. *Id.* at 31. The second part of Schleicher's argument depends on the first: the EPA forbids an employer from lowering an employee's wages *only if* it does so to remedy an underlying EPA violation. *See* 29 U.S.C. § 206(d)(1). If the first part of Schleicher's argument fails, the second fails as well.

We have read the EPA to establish a three-step burden-shifting scheme:

*First*, "[i]n order to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Beck-Wilson*, 441 F.3d at 359 (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). "Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Id.* at 360 (quoting *Peters v. City of Shreveport,* 818 F.2d 1148, 1153 (5th Cir. 1987), *abrogated on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989)).

*Second*, "[o]nce the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act:  (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998).[1]  Importantly, "a defendant bears both the burden of persuasion and production on its affirmative defenses." *Beck-Wilson*, 441 F.3d at 364–65.

*Finally*, if an EPA defendant proves an affirmative defense, an EPA plaintiff "must come forward with evidence demonstrating the existence of a triable issue of fact" regarding pretext. *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 844 (6th Cir. 1997); *accord Balmer v. HCA, Inc.*, 423 F.3d 606, 613 (6th Cir. 2005), *abrogated on other grounds by Fox v. Vice*, 563 U.S. 826 (2011).  Put another way:  an "EPA plaintiff bears the burden of *producing* evidence of pretext solely where a reasonable jury viewing the defendant's evidence could find only for the defendant." *Buntin*, 134 F.3d at 800 n.7.  Accordingly, "[i]n order 'to survive [a] defendant's motion for [summary judgment], the EPA plaintiff need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual.'" *Beck-Wilson*, 441 F.3d at 365 (quoting *Buntin*, 134 F.3d at 799).  "Rather, as the party who bears the burden of persuasion, the defendant who makes a motion [for summary judgment] must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." *Id.*

Applying these principles, we may uphold the district court's grant of summary judgment "only if the record shows that [Preferred] established the ["factor other than sex"] defense so clearly that no rational jury could have found to the contrary." *Id.* (quoting *Buntin*, 523 F.3d at

---

[1]Schleicher contends that "[t]he EPA is a strict liability statute" because a plaintiff need not show *intentional* discrimination to establish a prima facie case.  Appellant Br. at 20–21.  He is mistaken.  Although intent is not an element of the *first* step of proving an EPA violation, the EPA makes plain that "not all differences in pay for equal work constitute violations of the Act." *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997).  Thus, an employer's intent is relevant under the EPA's second step, because an employer-defendant can defeat a claim of discrimination by proving any of the EPA's four statutorily enumerated affirmative defenses. 29 U.S.C. § 206(d)(1).  An employer's intent is also relevant under the EPA's third step, which addresses pretext. *See Timmer*, 104 F.3d at 844.  Accordingly, under the EPA, an employer's intent *does* matter—not at the first step, but certainly at the second and third.

800). Such is the case here. The district court held—and Preferred does not appear to dispute—that Schleicher established a prima facie EPA case. We agree: Schleicher has satisfied the EPA's first step because he has shown that Preferred paid him $694,159.38 more than Piotrowski for performing the same work. *Beck-Wilson*, 441 F.3d at 359. However, Preferred has proven that this pay disparity was due to a "factor other than sex"—namely, when given both pay options, Piotrowski *chose* to be compensated pursuant to the $100,000 salary plus 10% draw model. Further, Schleicher's claims of pretext are unconvincing.

Accordingly, both parts of Schleicher's EPA argument fail. First, Preferred did not violate the EPA when it paid Schleicher more than Piotrowski. Nor did it violate the EPA when it equalized Schleicher's and Piotrowski's compensation models, because there was no underlying EPA violation to "cure." The district court properly entered summary judgment in favor of Preferred.

## 1. Preferred did not violate the EPA when it paid Schleicher more than Piotrowski between 2009 and 2013.

The first part of Schleicher's argument—that Preferred violated the EPA when it paid him more than Piotrowski—is somewhat ambiguous. He argues that even if Preferred did not violate the EPA in 2009 when it hired Schleicher and agreed to his 20% profit-pool-only compensation model, the resulting disparity between Schleicher's income and Piotrowski's "*became* violative of the EPA by 2013" (or perhaps sometime between 2009 and 2013). Appellant Br. at 21; *see id.* at 4 ("A facially neutral pay model may *become* violative of the EPA when the employer maintains the pay differential over an extended time."). Schleicher contends that Seipenko knew that she was paying Schleicher substantially more than Piotrowski. *Id.* at 22. By maintaining that disparity quarter after quarter, Schleicher argues, Preferred violated the EPA. *Id.* at 22–24.

We disagree. Schleicher has established a prima facie case under the EPA: Preferred paid Schleicher $694,159.38 more than Piotrowski between 2009 and 2013, which is enough to satisfy the EPA's first step. *See Beck-Wilson*, 441 F.3d at 359. However, whether Preferred violated the EPA turns on two additional questions. First, can Preferred prove that this pay disparity was due to any of the four grounds that the EPA lists as affirmative defenses? Second,

assuming that Preferred can make this showing, is there a fact dispute as to whether its justifications are pretextual? We conclude that the answer to the first question is "yes," and the answer to the second is "no."

### a. Preferred paid Schleicher more than Piotrowski because of a "factor other than sex."

First, the record in this case is clear that Preferred paid Schleicher more than Piotrowski because of a "factor other than sex," 29 U.S.C. § 206(d)(1): Piotrowski *chose* to be compensated pursuant to her $100,000 salary plus 10% profit-pool draw model rather than the model that Schleicher chose.

The EPA's fourth, "factor other than sex" defense was intended to be "a broad principle." *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1030 (6th Cir. 1983) (quoting 109 Cong. Rec. 9203 (1963) (statement of Rep. Griffin)). It is not, however, a "blanket" protection: it "does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988). We strictly interpret this defense: "[U]nless the factor of sex provides *no* part of the basis for the wage differential, the requirements [for the defense] are not met." *Beck-Wilson*, 441 F.3d at 365 (quoting *Brennan v. Owensboro-Daviess Cty. Hosp.*, 523 F.2d 1013, 1031 (6th Cir. 1975)); *see also Timmer*, 104 F.3d at 843 ("[T]he burden of proving that a factor other than sex is the basis for a wage differential is a heavy one. . . . If proven, though, the defendant is absolved of liability as a matter of law.").

Even viewing the evidence in the light most favorable to Schleicher, we conclude that sex played no role in Preferred's decision to pay Schleicher more than Piotrowski. To begin, Preferred adopted a profit-pool model because *Schleicher* negotiated with Seipenko to create that compensation plan. Schleicher points to Piotrowski's statement during her deposition that she "didn't have the choice" to switch back to a commissions-based model after Preferred implemented the profit pool. Appellant Br. at 8 (quoting R. 39-3 (Piotrowski Dep. at 47:1–5) (Page ID #463)). That concession, Schleicher claims, "directly conflicts with" Preferred's theory that Piotrowski earned less than Schleicher because of her "personal choice." *Id.* at 9. Not so. The relevant "personal choice" in this case is different: Seipenko offered Piotrowski the *exact*

*same compensation model* (a 20% profit-pool draw) that Schleicher received, and Piotrowski declined that offer. Indeed, Piotrowski testified that at no point during Schleicher's tenure with Preferred did she *ever* want to alter her compensation model to match Schleicher's model. Moreover, Schleicher knew that Piotrowski did not want to be paid on a profit-pool-only basis because she thought it was risky.

Schleicher tries to analogize his case to our decision in *Bence v. Detroit Health Corporation*, but that case is inapposite. Defendant Detroit Health Corporation ran health spas, "each of which was divided into a men's division and a women's division which operated on alternate days." *Bence*, 712 F.2d at 1025. Male managers ran the men's division, and female managers ran the women's division. *Id.* at 1025–26. Because Detroit Health Corporation's "gross volume of membership sales to women was 50% higher than the gross volume of membership sales to men," *id.* at 1026, it compensated its managers differently based on their sex: "Male managers were paid 7.5% of the individual spa's gross sales of memberships to men. Female managers were paid 5% of gross sales of memberships to women. Male assistant managers received 4.5% of gross sales to men. Female assistant managers received 3% of gross sales to women." *Id.*

Detroit Health Corporation attempted to defend its compensation scheme under the EPA's fourth affirmative defense, arguing that "a legitimate business policy of providing male and female employees equal total remuneration" was a "factor other than sex." *Id.* at 1029–31. We rejected that defense, reasoning that "segregating male and female employees into men's and women's departments . . . *plus* application of a lower commission rate *only* to those who sold memberships to women effectively locked [Detroit Health Corporation's] female employees, and only female employees, into an inferior position regardless of their effort or productivity." *Id.* at 1031.

Schleicher ignores two important differences between his case and *Bence*. First, *Bence* involved a transparent example of sex-based pay discrimination. Detroit Health Corporation paid its male managers (who worked in a male-only division) at a rate 50% higher than its female managers (who worked in a separate, female-only division). It did so purportedly to equalize compensation between its male and female managers. In Schleicher's case, there is no

evidence that sex played *any* role in Preferred's decision to compensate Schleicher (a man) and Piotrowski (a woman) pursuant to different compensation models. Second, the *Bence* plaintiffs were never in a position to choose *how* they would be compensated: women received one (lower) rate, while men received a different (higher) rate. R. 51 (5/18/15 Op. and Order at 22–23) (Page ID #1317–18). In contrast, Preferred gave Schleicher and Piotrowski the option to select the compensation model that suited them best. Piotrowski hedged her risk by selecting a model that guaranteed her a $100,000 salary in exchange for a smaller (compared to Schleicher) draw from the profit pool—her personal choice was clearly a "factor other than sex," and it explains why Schleicher outearned Piotrowski between 2009 and 2013. At bottom, *Bence* does not help Schleicher.

We thus conclude that Preferred has carried its heavy burden of proving that the disparity between Piotrowski's and Schleicher's pay was due to a "factor other than sex." Neither party disputes that Schleicher outearned Piotrowski during his time at Preferred. However, this disparity arose because Schleicher convinced Seipenko to add a new profit-pool model, and the disparity continued only because Piotrowski declined that model because she did not want to be paid exclusively from the profit pool. Because Preferred has demonstrated that "the factor of sex provide[d] *no* part of the basis for the wage differential" between Schleicher and Piotrowski, it has established an affirmative defense to Schleicher's prima facie EPA case. *Beck-Wilson*, 441 F.3d at 365 (quoting *Owensboro-Daviess Cty.*, 523 F.2d at 1031).

### b. Schleicher has not shown that Preferred's proffered reasons for maintaining the pay disparity are pretextual.

Because Preferred established an affirmative defense under 29 U.S.C. § 206(d)(1)(iv), Schleicher must raise a genuine issue of fact that Preferred's justification for paying him more than Piotrowski is pretextual. *See Buntin*, 134 F.3d at 800 n.7. He has not done so.[2] Because this is a burden of production, not persuasion, Schleicher "need not set forth evidence from

---

[2]Schleicher arguably waived many of his arguments about pretext in this case. He addressed pretext in cursory fashion in his opposition to Preferred's motion for summary judgment. R. 43 (Pltf.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 18) (Page ID #787). Indeed, the district court thought that Schleicher had introduced no evidence of pretext. R. 51 (5/18/15 Op. and Order at 23) (Page ID #1318). However, in his briefing before the district court, Schleicher alleged pretext and, in support of this argument, highlighted his success at Preferred and listed several discriminatory comments that Seipenko allegedly made. R. 43 (Pltf.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 16–20) (Page ID #785–89). Moreover, Preferred has not raised a waiver argument.

which a jury could infer that [Preferred's] proffered reason for the wage differential is pretextual." *Beck-Wilson*, 441 F.3d at 365 (quoting *Buntin*, 134 F.3d at 799). Even with this low bar in Schleicher's favor, he has not produced evidence of pretext sufficient to withstand summary judgment.

In his brief on appeal, Schleicher lists several comments Seipenko allegedly made and incidents that occurred at Preferred that Schleicher claims evidence pretext. Appellant Br. at 30–31. Most relate to Seipenko's decision to cut Schleicher's pay in 2013, not her continued maintenance of the pay disparity between Schleicher and Piotrowski from 2009 to 2013. *Id.* Although Schleicher does provide three examples that seem to relate directly to the disparity (and not the 2013 pay cut), all three are unavailing.

First, Schleicher claims that "Seipenko directed exclusionary comments toward" him because he was a man. *Id.* at 30. He does not, however, explain why Seipenko's alleged gender animus caused her to *pay him more* than his female co-worker, Piotrowski. Second, Schleicher argues in conclusory fashion that "[t]he nearly $700,000 disparity itself is evidence of pretext." *Id.* That is enough to establish a prima facie case under the EPA; it is non-responsive to Preferred's affirmative defense under § 206(d)(1)(iv). Finally, Schleicher repeats his claim that Piotrowski had "no choice" when Preferred switched to the profit-pool compensation model. *Id.* at 31. Again, this is irrelevant: the "choice" justifying Preferred's affirmative defense is Piotrowski's decision to be paid a $100,000 salary plus 10% of the profit pool. At bottom, Schleicher does not present any evidence suggesting that Preferred's proffered reason for paying him more than Piotrowski—that Piotrowski did not want to be paid under the same model as Schleicher—is pretextual. Because Schleicher has produced no evidence raising a fact dispute about Preferred's "factor other than sex" defense, his claim that Preferred violated the EPA when it paid him more than Piotrowski fails.

**2. Preferred did not violate the EPA in 2013 when it modified Schleicher's compensation plan.**

Schleicher also argues that Preferred violated the EPA when it changed his compensation plan to match Piotrowski's. This second part of his argument necessarily depends on the first part. The EPA provides "[t]hat an employer who is paying a wage rate differential in violation

of [§206(d)(1)] shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1). "Under the express terms of the EPA, when a prohibited sex-based wage differential has been proved, an employer can come into compliance only by raising the wage rate of the lower paid sex." 29 C.F.R. § 1620.25 (2016); *see Corning Glass Works*, 417 U.S. at 207 ("[T]o remedy violations of the Act, '[t]he lower wage rate must be increased to the level of the higher.'" (quoting H.R. Rep. No. 309, at 3 (1963))). Thus, an employer violates the EPA by lowering an employee's wages *only if* it does so to remedy an underlying EPA violation.

That is not the case here. Because Preferred has proven its affirmative defense under § 206(d)(1), the fact that it changed Schleicher's compensation plan to match Piotrowski's is irrelevant: there was no EPA violation to cure. Schleicher argues that "[b]y reducing Schleicher's commissions from 20% to 10%, the employer violated the plain terms of the EPA." Appellant Br. at 32. The plain terms of the EPA suggest otherwise: Preferred's decision to cut Schleicher's "commissions" was not actionable discrimination because the underlying pay disparity between Schleicher and Piotrowski did not violate the EPA. Thus, the second part of Schleicher's EPA argument also fails.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment in favor of Preferred.