**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0094n.06

Case No. 18-1424

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>T'NEYA JENKINS,</td><td>)</td><td rowspan="12"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>THE REGENTS OF THE UNIVERSITY OF</td><td>)</td></tr>
<tr><td>MICHIGAN HEALTH SYSTEM, et al.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Defendants-Appellees.</td><td>)</td></tr>
</table>

FILED
Feb 26, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: BATCHELDER, SUTTON and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiff T'Neya Jenkins, an African-America woman, worked for The Regents of the University of Michigan Health System ("U-M") for ten years before being terminated for time-card fraud. Jenkins successfully challenged her termination through U-M's grievance process, and U-M converted her termination into a two-week disciplinary layoff. As a condition of reinstating Jenkins' employment, U-M placed her on a stringent performance plan. When Jenkins' department underwent reorganization, U-M informed Jenkins that she was ineligible for promotion because she had failed to adhere to the performance plan.

Jenkins sued U-M, her manager Careylynn Flaugher, her former manager Linda Gobeski, U-M Health System Human Resources Consultant Jennifer Stalmack, and Nursing Service

Director Sue Kofflin[1] under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*, alleging the performance plan served as a pretext for race discrimination and retaliation. The district court granted summary judgment in favor of U-M, finding that Jenkins could not establish a prima facie case of race discrimination or retaliation. We affirm.

## I.

### BACKGROUND

Jenkins began working at U-M in February of 2005 as a temporary central staffing resources employee. After becoming permanent and holding several different positions, Jenkins was eventually promoted to a Patient Service Assistant position in 2011. In the fall of 2014, Flaugher, a Caucasian female, became Jenkins' manager. In 2015, after working with Jenkins for several months, Flaugher gave Jenkins an overall positive annual review. However, in the summer of 2015, Flaugher observed discrepancies in Jenkins' timesheet when compared to the time Jenkins actually worked. Using the data collected from Jenkins' AVI security badge—what Jenkins used to gain access to and from the parking garage—Flaugher discovered that, between May 11 and August 3, 2015, Jenkins arrived to work late or left early on several occasions but failed to account for the 26.5 hours that she was paid for.

### Termination

On August 18, 2015, Flaugher and Stalmack met with Jenkins regarding the suspected time-fraud. When asked to explain why she was getting paid for time she did not work, Jenkins indicated that Gobeski, her former manager, permitted employees to "flex" their time. Pursuant to this informal "flex time" policy, Jenkins explained that as long as she worked the 80 hours

---

[1] Unless otherwise stated, defendants will be referred to collectively as U-M.

required of her within a given pay-period, she was free to come and go as she pleased. Jenkins further explained that, because they relied on an honor system, she could not provide documentation to prove she worked 80 hours during the periods in question. On August 24, 2015, Jenkins was terminated. Near the time Jenkins was terminated, Flaugher also terminated Katrina Hanosh, a Caucasian female who worked with Jenkins in the same position, for falsifying her timesheet.

### Grievance and PIP

Jenkins challenged her termination by filing a grievance with the University Review Committee. The Review Committee found that on April 17, 2015, Flaugher emailed Jenkins and her co-workers to advise that they were expected to "complete a time off request" if they needed to make up time, and that "it needed to be written on the time off slip." The Review Committee also found that on July 20, 2015, Flaugher spoke with Jenkins regarding arriving late. However, because Flaugher did not provide Jenkins any formal disciplinary action or require Jenkins to complete a time off slip at that time, the Review Committee granted Jenkins' grievance in part and converted her termination to a less severe two-week unpaid Disciplinary Lay Off ("DLO").

Jenkins' employment was reinstated, but with qualification. Jenkins returned to U-M on the condition that she be placed on a Performance Improvement Plan ("PIP"). Prior to returning to work, Flaugher and Stalmack met with Jenkins to discuss the PIP requirements. Among other things, the PIP required that Jenkins do the following each day: (1) call Flaugher upon her arrival and departure from work; (2) take screenshots of her work computer and timecard as she arrived and departed work and send them to Flaugher; (3) sign her bi-weekly timecard at the end of every pay-period; and (4) refrain from any "disruptive" or "discourteous" conduct. On December 14, 2015, Jenkins returned to work.

## Disciplinary Action Upon Reinstatement

Upon her return, Jenkins was disciplined on several occasions and began keeping a contemporaneous log of significant incidents involving Flaugher, Stalmack, and other employees within her department. The first instance in which Jenkins believed she was treated unfairly was January 26, 2016, when Flaugher approached Jenkins about taking personal phone calls and reminded Jenkins that she was on the PIP. On February 2, 2016, Jenkins was involved in an incident with Maria Bertoia, a Caucasian Patient Service Assistant in Jenkins' department. According to Jenkins' personal notes, Bertoia "asked loudly if [Jenkins] knew the difference between a vaginal delivery and C-Section and how to change one to another if it was wrong?" Jenkins notes that she "turned around in response and said yes!" Jenkins then asked Bertoia "if she was told to go back and look at [Jenkins'] charges and [Bertoia] said no."

On February 5, 2016, following the exchange between Jenkins and Bertoia, Flaugher had a coaching session[2] with Jenkins in which Flaugher advised Jenkins that her "behavior was demeaning to others and [that her] work performance [was] in question." On February 8, 2016, Jenkins sent Flaugher a memo expressing her disagreement with the disciplinary-coaching. In it, Jenkins told Flaugher that her primary issue was that "[she] was never questioned [by Flaugher] . . . before being brought into a coaching session." Jenkins followed up with an email to Stalmack on February 16, 2016, requesting that she "formally . . . investigate[] the [coaching session] . . . and or Flaugher." Stalmack forwarded the email she received from Jenkins to Flaugher, stating that Jenkins was "targeting everything."

The following month, on March 8, 2016, Flaugher sent Jenkins another coaching memo detailing numerous billing infractions. In the memo, Flaugher advised Jenkins that, between

---

[2] A coaching session is a form of disciplinary action that remains in the employee's personnel file.

January and March 2016, Jenkins: (1) failed to enter the date of birth for eight patients; (2) failed to include the correct medical procedure; and (3) entered incorrect billing charges for patient procedures. Jenkins attributed her mistakes to the new billing system that Flaugher instituted.

Jenkins also did not fully comply with the PIP call-in requirements. According to Flaugher, on January 12 and February 23, 2016, she failed to call Flaugher at the start of her shift, as required by the PIP.[3] Again, on June 4, 2016, Jenkins failed to call Flaugher at the end of her shift.[4] Consequently, on June 7, 2016, Flaugher met with Jenkins and advised her that she was extending the PIP to September 7, 2016. After Flaugher extended the PIP, the same thing occurred on July 5, 2016, when Jenkins did not call Flaugher to inform her she would be late due to a flat tire. Following this incident, Flaugher placed Jenkins on a one-day DLO.

### Performance Evaluation

U-M employees are given annual performance reviews evaluating goals, core job responsibilities, and competencies using four ratings: N (not met), A (approaching), S (solid), and E (exemplary). Managers write the evaluations, which are then reviewed by the employee, who may suggest changes. During Jenkins' June 2016 annual evaluation, Flaugher rated Jenkins with an A in several areas. Jenkins agreed with the rating in some instances, such as billing, peer recognition and timesheet submission, but disagreed with others. Specifically, Jenkins disagreed with Flaugher on attendance. There, Jenkins conceded to being late, but stated she was never late during the specific evaluation period. After listening to Jenkins' concerns, Flaugher changed some of the "approaching ratings," but did not change Jenkins' rating on attendance.

---

[3]On February 24, 2016, Flaugher emailed Stalmack stating: "the saga continues with [Jenkins]," and informed her that Jenkins was not adhering to the PIP.

[4]During the weeks of March 13, March 27, April 10, April 24, and May 8, 2016, Jenkins initialed her daily timesheets, but failed to sign them weekly, as required by the PIP, which resulted in Jenkins missing time on her timesheets.

**Reclassification and Jenkins' Denial of Promotion**

On July 14, 2016, Flaugher informed Jenkins that the Women's Birth Center would be reorganizing and that the Patient Service Assistant position that Jenkins held would be reclassified as an Administrative Assistant Associate. The new role was a promotional transfer. According to U-M's policy, employees "must have prior satisfactory work performance" to be considered for a promotional transfer. Because Jenkins was still on the PIP and had other performance-related issues, Flaugher advised Jenkins that she was ineligible for the promotional transfer and would have to apply for a lateral position as a Unit Clerk.

**EEOC Charge**

The following day, on July 15, 2016, Jenkins filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against based on her race by being "subjected [] to heavy scrutiny and unwarranted performance evaluations" and "different terms and conditions of employment" than her Caucasian counterparts. The EEOC dismissed Jenkins' complaint on July 20, 2016 and issued her a "right to sue" letter.[5] On October 20, 2016 Jenkins brought this action, alleging racial discrimination and retaliation in violation of Title VII, and Michigan's Elliott-Larsen Civil Rights Act. U-M filed a motion for summary judgment, which the district court granted, finding that Jenkins had not made out a prima facie case of racial discrimination or retaliation. Jenkins timely appeals.

---

[5] On December 25, 2016, Jenkins gave Flaugher a two-week notice, and subsequently began her new job as Senior Administrative Assistant with ECMO Overhead Department.

## II.

## ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752 (6th Cir. 2016). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995) (citation omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To survive summary judgment, the nonmoving party "must present more than a scintilla of evidence in support of his position . . . such that a jury could reasonably find for the [nonmovant]." *Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994) (citing *Liberty Lobby, Inc.*, 477 U.S. at 252).

In conducting this analysis, we draw all inferences in the light most favorable to the non-moving party—here, Jenkins. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Racial Discrimination

Both Title VII and the Elliott-Larsen Act make it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2; Mich. Comp. Laws § 37.2202(a). "We review claims of alleged race discrimination brought under . . . the Elliott-Larsen Act under the same standards as claims of race discrimination brought under Title VII . . .

." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013).

"At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on a Title VII race-discrimination claim" or retaliation claim. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). Direct evidence is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006).

If the plaintiff offers no direct evidence, but only circumstantial evidence of racial discrimination, we consider plaintiff's claims "[u]nder the three-step [*McDonnell Douglas*] burden-shifting framework." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Under this framework, a plaintiff must first make out a prima facie case of racial discrimination. *Newman,* 266 F.3d at 405. To establish a prima facie case of discrimination, a plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for the position and performed it satisfactorily; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated, non-protected employees, or was replaced by a person outside the protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

If the plaintiff is able to make a prima facie showing of discrimination, she "in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (quotations omitted). The burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Newman*, 266 F.3d at 405. If the employer meets this burden, the burden shifts back to the plaintiff

to show that the employer's nondiscriminatory explanation is a mere pretext for intentional discrimination. *Id.*

Jenkins has not offered direct evidence of racial discrimination. We therefore apply the three-step *McDonnell Douglas* burden-shifting framework to determine whether she offers sufficient circumstantial evidence of racial discrimination.

### a. Prima facie case of racial discrimination

We begin with the threshold question of whether Jenkins establishes a prima facie case of racial discrimination. It is undisputed that Jenkins satisfies the first and third elements of a prima facie race-discrimination case. The parties dispute, however, whether Jenkins can establish the fourth element: that she was treated differently than similarly-situated, non-protected U-M employees.

The district court agreed with U-M and concluded that Jenkins fails to create a genuine issue as to whether she was treated differently than similarly situated, non-protected persons. However, such a conclusion is not necessarily fatal to Jenkins' prima facie case. As we have explained, a plaintiff can alternatively satisfy the fourth element of a prima facie racial discrimination claim by demonstrating she was replaced by a person "outside the protected class." *Laster*, 746 F.3d at 727. Though Jenkins mistakenly identifies Bertoia as the non-protected person who was promoted in her place, the record reflects that Jenkins was replaced by Tina Dale, who is also Caucasian.[6] Thus, contrary to the district court's mistaken conclusion, we find that Jenkins satisfies the fourth element by establishing in the record that she was replaced by a person outside the protected class.

---

[6] Bertoia was also promoted, but the record does not indicate that she replaced Jenkins.

But this does little to help Jenkins because she fails to establish the second element: that she was "qualified for the position." Jenkins argues that "[t]he only reason [she] was ineligible for any promotion was due to Flaugher's continued, unilateral extensions of the PIP without reason or justification." Appellant's Br. at 7. According to Jenkins, Flaugher extended the PIP as a pretext for racial discrimination to prevent her from being promoted to the Administrative Assistant Associate position or the Clerk Immediate Supervisor positions. Appellant's Br. at 17. The undisputed record, however, contradicts Jenkins' assertion.[7]

Pursuant to U-M's policy, to be eligible for a promotional transfer, an employee "must have [had] prior satisfactory work performance." Jenkins had several disciplinary issues upon returning to work. First, Jenkins did not comply with the calling requirements in the PIP. As demonstrated by the record, on January 12, 2016, she failed to call Flaugher when she arrived to work; on February 23 and June 5, 2016, she failed to call Flaugher when her shift ended; and again, on July 5, 2016, she failed to call Flaugher prior to her shift to advise that she had a flat tire and would be late. The latest incident resulted in Flaugher's placing Jenkins on a one-day DLO.

Second, Jenkins did not abide by the PIP's admonition for her to refrain from any "disruptive" or "discourteous" conduct. Jenkins notes that, when Bertoia questioned her about whether she knew how to bill a charge for a vaginal delivery, as opposed to a C-Section, Jenkins "turned around in response [to Bertoia] and said yes!" Flaugher determined that Jenkins' conduct was "demeaning to others," in violation of the PIP. Jenkins makes no credible argument to the

---

[7] Although U-M failed to raise this specific ground below, and the district court granted summary judgment on erroneous grounds, "we may affirm for any reason presented in the record, even if the reason was not raised below." *Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 514 (citing *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003).

contrary. Finally, Jenkins acknowledges that she received a disciplinary coaching for numerous billing infractions between January and March 2016.

Thus, there is no genuine issue regarding whether Jenkins' numerous performance issues made her unqualified for the promotional transfer to the Administrative Assistant Associate or any other position. Consequently, Jenkins fails to establish a prima facie case of racial discrimination. *Laster*, 746 F.3d at 726.

Because Jenkins fails to establish a prima facie case of racial discrimination, we need not proceed with the remainder of the *McDonnell Douglas* burden-shifting analysis to determine whether U-M's proffered reasons for any alleged adverse action were pretextual. *See Tilley v. Kalamazoo Cty. Road Comm'n*, 777 F.3d 303, 309 n.3 (6th Cir. 2015).

### C. Retaliation

### a. Prima facie case of racial discrimination

Jenkins' second claim is that U-M retaliated against her after she engaged in protected activity. The district court granted U-M's summary judgment motion on Jenkins' retaliation claim, concluding that she did not engage in protected activity prior to any alleged discriminatory conduct. We agree.

To establish a prima facie case of retaliation, Jenkins must demonstrate that (1) she engaged in a protected activity, (2) the defendant knew about the protected activity, (3) the defendant took an adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

Jenkins first argues that she engaged in protected conduct in two instances: first, when she filed her grievance, and second, when she emailed Stalmack requesting that she investigate Flaugher and the incident with Bertoia. Protected conduct includes "complaining to anyone . . .

about allegedly unlawful practices . . . ." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). This requirement comes with an important qualification. While we "do not 'require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision[,]'" we have repeatedly explained, that general "complaints to management" do not constitute protected activity when the plaintiff does not "object[] to discriminatory conduct against her based on her membership in a protected class." *Braun v. Ultimate Jetcharters*, LLC, 828 F.3d 501, 511 (6th Cir. 2016) (quotations and citations omitted).

Jenkins did not allege in her grievance that she was discriminated against based on her race. Rather, the sole basis of her grievance was that she did not engage in time card fraud because Gobeski permitted her to use "flex time." The record is devoid of any evidence suggesting Jenkins so much as mentioned unfair treatment in her grievance, much less race-based discrimination. Likewise, in her email to Stalmack, Jenkins did not state she believed that Flaugher's actions were motivated by race. Instead, Jenkins asked Stalmack to "investigate" the "coaching session" and "Flaugher." Simply that Bertoia is Caucasian and Jenkins African-American does not, by itself, infer that Jenkins alleged racial discrimination in her complaint.

Thus, viewing the facts in the light most favorable to Jenkins, she fails to raise a genuine issue as to whether her grievance, or any other communication during her employment with U-M, constitutes protected activity. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (holding that the plaintiff's actions did not constitute protected activity where "the record [did] not contain any evidence that [the plaintiff] specifically alleged discriminatory employment practices in the [complaint made to his manager]").

As her final argument, Jenkins contends that "[f]iling a Charge of Discrimination [with the EEOC] undoubtedly constitutes protected activity." Appellant Br. at 21. This is true. *Thompson*

*v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011).  But as the district court determined correctly, Jenkins filed her complaint with the EEOC on July 15, 2016, one day after Flaugher informed Jenkins that she would not be eligible for promotion, and well after any other instances of alleged retaliation.  Because Jenkins fails to demonstrate a genuine issue as to whether she suffered adverse employment action after engaging in protected activity, her retaliation claim fails.

**III.**

**CONCLUSION**

For these reasons, we affirm the district court.