NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0714n.06

No. 11-1218

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 03, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| L. RENEE MALLISON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| HAWORTH, INC., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: BOGGS, SUHRHEINRICH and COOK, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.** Plaintiff L. Renee Mallison brought Equal Pay Act, Title VII, and Elliot Larson Civil Rights Act claims against her former employer, Defendant Haworth, Inc., for paying her less than some of its male employees in similar positions. The district court granted Haworth's motion for summary judgment. We **AFFIRM**.

## I. Background

### A. Facts

Defendant Haworth, Inc. (Haworth) is a manufacturer of office furniture that employs more than six thousand people worldwide. Its global headquarters is in Holland, Michigan. Plaintiff L. Renee Mallison (Mallison) joined Haworth as a CRT Plant Clerk at its Ludington, Michigan components facility on January 23, 1995. Mallison had previously held a variety of jobs, all of which were clerical in nature. She had no outside supervisory or manufacturing experience.

1

By all accounts, Mallison did well at Haworth and earned opportunities for advancement. She was promoted to Associate Material Planner Grade 06 in 1996. Her job duties included reviewing supply orders, providing support to the manufacturing and distribution departments, and coordinating engineering changes on manufactured products. Mallison also supervised two clerical employees. In September 1997, Haworth promoted Mallison to Associate Material Planner Grade 12. Originally hired at an annual salary of $15,600, she was now earning more than $30,000 per year.

Mallison claims she was told that earning a bachelor's degree would help her advance at Haworth. Accordingly, in December 1999, she decided to pursue a degree at Davenport University. Haworth allowed Mallison to transition to a part-time Office Coordinator position for several years while earning her bachelor's degree and raising her children to school age, after which Mallison assumed full-time Office Coordinator responsibilities. Haworth steadily increased Mallison's salary when she was working part-time, and increased it again when she returned to full-time employment. Equipped with a bachelor's degree and several years of experience at the company, Mallison informed her direct supervisor, Plant Manager Brian DeKraker, of her desire to advance into management, or at least into "a more challenging position than a clerical position." DeKraker took this request seriously and began exploring opportunities for Mallison to prove her leadership.

In April 2006, Mallison was promoted to a Coordinator II position within Haworth's engineering department and given a seven-percent raise. In this new role, Mallison was primarily responsible for coordinating the operation of computer-information systems that supported the plant's manufacturing processes, including imputing data and creating files. There is some dispute

as to whether Mallison supervised employees as a Coordinator II.[1] While serving as a Coordinator II, Mallison also assumed a leadership role in implementing the Haworth Management System initiative at the company's Ludington plant.

To further position Mallison for advancement, DeKraker suggested she "shadow" Dale Wright, a seven-year Production Supervisor II at Haworth. Prior to joining Haworth, Wright spent twenty years supervising manufacturing operations, including serving as manufacturing superintendent and plant manager. At her deposition, Mallison said she understood that the purpose of the shadowing opportunity was to "give me an understanding, a very clear understanding, of what a supervisor position entailed, to make sure that I would find that a satisfactory position, and to make sure that, you know, that would be something that I would be interested in." Similarly, DeKraker testified that he wanted Mallison to shadow Wright to get "a real feel and understanding of what day-to-day activities are like as a supervisor."

When Wright subsequently announced his intent to retire, DeKraker met with Jamie Eckerman, Haworth's Operations Team Manager, to decide how to post the open position. Although all Production Supervisors performed the same essential functions, Haworth recognized Production Supervisors as grade II, IA, or IB, depending on their skill, knowledge, education, and experience. Heavily credentialed Production Supervisors, like Wright, were typically Production Supervisor IIs; substantially less credentialed Production Supervisors, on the other hand, often served as Production

---

[1] Although Mallison alleges she did supervise other Haworth employees as a Coordinator II, and cites a performance review commending her for displaying "[b]ehaviors [e]xpected of [t]hose [w]ho [s]upervise [o]thers," *see* R. 28-4 at 4, she fails to identify any subordinates with specificity. For its part, Haworth denies that Mallison supervised anyone and cites its official position description for Mallison's job, which contains no mention of supervisory responsibilities. *See* R. 25-3 at Ex. 7.

3

Supervisor IBs. DeKraker and Eckerman decided to post the position as "Production Supervisor IB" to encourage candidates with a broad range of credentials to apply. Although Wright had earned $68,484 as a Production Supervisor II, Haworth posted the salary range of the open Production Supervisor IB position as $37,284 to $55,952. In accordance with Haworth's ordinary policy, the position title, grade, and salary range were available for applicants to preview before applying for the opening.

Once the position had been posted, DeKraker encouraged Mallison to submit an application. After interviewing her and other candidates, DeKraker and Eckerman decided to offer Mallison the promotion. Taking into account her qualifications, current pay level, and the current compensation of other Haworth employees, Haworth's Compensation Analyst offered Mallison a starting salary of $39,000 (a seventeen-percent increase from her Coordinator II salary). Mallison accepted the position on September 30, 2007.

Mallison appears to have served as a Production Supervisor IB without incident until February 2009, when she learned that fellow Production Supervisor Mark Tomczak was paid more than $50,000 per year. Tomczak had come to Haworth with four years of experience supervising a manufacturing plant of fifty to seventy employees. He had served as a Production Supervisor IA for three years before being promoted to Production Supervisor II, a position he had held for one year before Mallison learned that his salary was more than hers. Mallison approached DeKraker about the salary difference in March 2009 and, at her request, was provided documentation of her own pay grade and position description. Later, she had a conversation with Eckerman, in which he informed her that Tomczak made more money because he came "from the outside."

4

Mallison grew increasingly unhappy at Haworth after the revelation of Tomczak's salary and DeKraker and Eckerman's unsatisfying answers. She had an unrelated employment disagreement with Eckerman on the morning of April 20, 2009, and never returned to work after leaving for lunch.

## B. Proceedings Below

After exhausting her administrative remedies, Mallison brought suit in the federal district court for the Western District of Michigan, alleging that Haworth had violated the Equal Pay Act (EPA), Title VII, and Michigan's Elliot Larson Civil Rights Act (ELCRA) by paying fellow Production Supervisors Wright and Tomczak more money than her. The district court concluded that there was no question of material fact that the salary difference was due to the legitimate consideration of relevant supervisory and manufacturing experience and granted Haworth's motion for summary judgment.[2] Mallison appeals.

## II. Analysis

### A. Standard of Review

We review a district court's decision to grant a motion for summary judgment *de novo. Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Summary judgment is proper if the court determines that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although a court must draw all reasonable inferences in the light most favorable to the non-moving party, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to

---

[2] Mallison's suit also alleged that Haworth violated the EPA by paying fellow Coordinator II Mike Woods a higher salary than Mallison. The district court denied Haworth's motion for summary judgment on this claim but Mallison voluntarily settled it in order to pursue an immediate appeal on her Production Supervisor claims.

find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B. Equal Pay Act

"The EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing 29 U.S.C. § 206(d)(1)). Thus, to establish a *prima facie* case under the EPA, a plaintiff must demonstrate "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions'. . . ." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

If a plaintiff establishes a *prima facie* case of wage discrimination under the EPA, an employer can establish an affirmative defense by showing that its compensation decision was based on (1) seniority; (2) merit; (3) "a system which measures earnings by quantity or quality of production"; or (4) any "factor other than sex." 29 U.S.C. § 206(d)(1)*; Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (citing *Corning Glass Works*, 417 U.S. at 196). The employer bears the burden of establishing that its proffered explanation for the wage differential is true. *Balmer v. HCA, Inc.*, 423 F.3d 606, 613 (6th Cir. 2005) *abrogated on other grounds by Fox v. Vice*, 131 S.Ct. 2205 (2011). If it does, the burden returns to the plaintiff to show that the employer's explanation is pretextual. *Id*. (citing *Buntin*, 134 F.3d at 800 n.7).

Although the district court found that Mallison had established a *prima facie* case of discrimination under the EPA, it ultimately concluded that she failed to rebut Haworth's affirmative defense that the salary differences were due to legitimate variances in the employees' supervisory

6

and manufacturing experience.  We have held, and Mallison does not seriously contest, that such industry-related experience is a "factor other than sex," which may legitimately explain wage differentials for otherwise equal work. *Id*. at 612-13.  Rather than disputing this principle, Mallison claims that Haworth's reliance on employee experience is pretextual.   She raises several arguments in this regard, each of which is addressed below.

### 1.  Consistency

Mallison first claims that Haworth's proffered justification for her lower salary is pretextual because it is inconsistent with its assertions to her, the Equal Employment Opportunity Commission (EEOC), and the district court, and because it defies the company's own pay policy.  Mallison implores us to consider these inconsistencies with more scrutiny than the district court, which she boldly claims  "ignored" and "failed to comprehend" the "obvious" discrepancies in Haworth's affirmative defense.

### a.  Haworth's representations to Mallison, the EEOC, and the district court

Mallison's assertion that Haworth's explanations to her, the EEOC, and the district court have been inconsistent lacks merit.  When she asked Eckerman why Tomczak made more money, Eckerman, who was not involved in compensation decisions at Haworth, informally told her that Tomczak was paid more because he came "from the outside."  In a formal correspondence with the EEOC, Haworth, through defense counsel, represented that Tomczak earned a higher salary because "unlike the Charging Party who had no prior management experience, Mr. Tomczak has over five years of manufacturing and supervisory experience with Haworth."  Haworth maintained this defense throughout the district court proceedings, eventually moving for summary judgment on the dual

bases that (1) Mallison had failed to establish a *prima facie* case under the EPA because she could not show that her job as Production Supervisor IB was sufficiently similar to Tomczak's and Wright's jobs as Production Supervisor IIs; and (2) Mallison had failed to rebut its affirmative defense that the reason Wright and Tomczak were paid differently was that they had greater industry-related experience. Neither the fact that Haworth's response to the EEOC was more specific than its response to Mallison's own inquiry, nor the fact that Haworth presented another case theory alongside its long-standing position in federal court, indicates that Haworth's affirmative defense is pretextual. To the contrary, Haworth has remained consistent and logical in its explanation of the salary discrepancy. Even assuming that its explanations were somewhat different, which we do not believe they were, the assertion of compatible justifications for an adverse employment action is not indicative of pretext. *See, e.g., Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1458-59 (11th Cir. 1997) (finding no pretext where the defendant "gave differing explanations for the selection of employees to be discharged . . . [but] its reasons [were] not . . . necessarily inconsistent").

### b. Haworth's pay policy

Mallison's argument regarding Haworth's pay policy fails, as well. Here, she asserts that Haworth's explanation must be pretextual because the notion that employees are compensated according to their experience defies the company's own pay policy, which affirms that Haworth pays for the position, not the person in it. In pertinent part, Mallison relies on the following portions of Haworth's Salary Administration Guidelines:

> No single instrument is as important to wage and salary administration as the position description.
> . . .
> Our salary administration system is based on the worth of positions to the company - not on the individuals performing those positions. Determining how much a position

8

> is worth in terms of salary begins with the position evaluation process. Each position at Haworth has a position description that clearly defines the position's essential functions.
>
> Salaried positions are evaluated by analyzing internal worth and external salary and market factors. Both processes help ensure internal equity among positions and functional areas is maintained.

Because all Production Supervisors perform the same functions regardless of grade, Mallison argues, Haworth's own guidelines suggest they should be paid equally. This would seem logical, but for the fact that Haworth requires weightier credentials of an employee in a higher-grade position. Thus, although all Production Supervisors perform similar tasks, the "worth of [the] positions to the company" is based upon the knowledge, skill, experience, and education of the class of employees capable of filling the role. That Haworth bases its salary ranges on the class of persons qualified to accept a particular grade appointment does not contradict Haworth's position that it will not determine compensation based on any one *individual*. Indeed, the fact that Haworth establishes the appropriate salary range for a given position before posting the opening suggests that it does not.

Moreover, Haworth's guidelines do not state that, once an individual qualifies for a particular position, his or her particularized credentials will play *no* role in the applicable salary determination. To the contrary, it points to a position description as being the "most important" component and the starting point from which salary determinations are made. This plain-language interpretation of the policy is consistent with Haworth's course of conduct in establishing Mallison's salary, where a payment range was set based on the Production Supervisor IB position description before the exact salary was calibrated according to the chosen candidate's credentials. Because interpreting Haworth's policy as a blanket prohibition on the consideration of an individual employee's

9

credentials would defy common business sense and the language of the policy itself, we reject Mallison's invitation to do so.

## 2. Basis in Fact

Mallison's second claim is that Haworth's affirmative defense—that it paid Production Supervisors Wright and Tomczak more because they had greater supervisory and managerial experience—is pretextual because it is simply not true. Here again, we disagree. It is undisputed that both Wright and Tomczak had experience supervising manufacturing facilities prior to joining Haworth; it is uncontested that Mallison had no experience in manufacturing at all. Moreover, Mallison does not challenge that Wright and Tomczak had each worked as Haworth Production Supervisors for several years while Mallison, at the time she complained of the salary disparity between her and Tomczak, had served as a Production Supervisor for less than eighteen months.

Mallison claims that, like Wright and Tomczak, she has general supervisory experience. Specifically, she asserts that she supervised two employees while serving as an Associate Material Planner and, although she cannot identify any subordinates specifically, that she supervised employees as a Coordinator II, as well. Construing the facts in the light most favorable to Mallison and assuming, *arguendo*, that she developed some supervisory experience at Haworth, such experience still pales in comparison to that of Wright and Tomczak. The evidence clearly shows that it was this discrepancy that entitled Wright and Tomczak to both a higher grade position and a higher salary.

Mallison's last and related argument is that if she truly had little or no supervisory experience as Haworth claims, she should not have been hired for the Production Supervisor IB position, which required at least two years of supervisory experience. Instead, she argues, she should have been

hired as a mid-grade Production Supervisor IA, which requires only a bachelor's degree, yet pays a higher salary. The undisputed facts defeat Mallison's claim. Although Mallison correctly notes that she was within the class of employees qualifying for a Production Supervisor IA position, that position was not posted. Instead, Haworth decided to post the vacancy created by Wright's retirement as an opening for a Production Supervisor IB. Mallison knew that this was the Production Supervisor grade for which she was applying and knew the salary associated with the open position. She also knew what her specific salary would be before accepting the job in September 2007. Lacking supervisory experience, Mallison appears correct that she was technically unqualified for the Production Supervisor IB position; if anything, however, this proves that Haworth was working to advance Mallison's employment opportunities, not to discriminate against her.

### C. Title VII and the ELCRA

Mallison also appeals the district court's dismissal of her Title VII and ELCRA claims based on the same facts. She raises no arguments particular to these claims, only urging this court to follow the principle that an employer found liable under the EPA is liable under Title VII and ELCRA, as well. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000) ("In this Circuit, a finding of liability under the Equal Pay Act requires a similar finding of liability under Title VII where both claims present the same conduct and evidence."). Because we conclude that the district court correctly dismissed Mallison's EPA claim, we also affirm its dismissal of Mallison's Title VII and ELCRA causes of action.[3]

---

[3] While Mallison quickly moves to her argument that establishing a meritorious case under the EPA means that she has also done so for her Title VII and ELCRA claims, she begins her analysis with the assertion that Title VII and ELCRA liability automatically flow from the establishment of a *prima facie* claim under the EPA. As Mallison's own case demonstrates, this is not legally accurate. Indeed, on these facts, Mallison loses her EPA claim to Haworth's unrebutted

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's order granting Haworth's motion for summary judgment on Mallison's EPA, Title VII, and ELCRA claims.[4]

---

affirmative defense that a factor other than sex, i.e., industry-related experience, caused it to pay different salaries to the employees at issue. Although she is able to establish a *prima facie* case under the EPA, her claims fail under Title VII and ELCRA since her, Wright's, and Tomczak's different work experience prevents her from establishing that they were similarly situated. *See Humenny v. Genex Corp.*, 390 F.3d 901 (6th Cir. 2004) (holding that claims "brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases" and that a *prima facie* case under either statute requires a showing that a female plaintiff suing for sex discrimination was "treated differently than similarly situated male employees for the same of similar conduct").

[4] Although Mallison's complaint makes a cursory request for damages "arising out of the constructive discharge from her job," R. 1 at 5, she raises no constructive discharge claim on appeal and makes no explicit demand for future damages or lost future income. It bears noting that any such claim would fail not only on the merits and for lack of preservation, but also would be considered forfeited by Mallison's voluntary resignation.