NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0379n.06

Case No. 24-1674

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>LAURA BENY,</td><td>)</td><td rowspan="2"><br>**FILED**<br>Jul 29, 2025<br>KELLY L. STEPHENS, Clerk</td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>ON APPEAL FROM THE UNITED</td></tr>
<tr><td></td><td>)</td><td>STATES DISTRICT COURT FOR</td></tr>
<tr><td>UNIVERSITY OF MICHIGAN; MARK D.</td><td>)</td><td>THE EASTERN DISTRICT OF</td></tr>
<tr><td>WEST; UNIVERSITY OF MICHIGAN LAW</td><td>)</td><td>MICHIGAN</td></tr>
<tr><td>SCHOOL; UNIVERSITY OF MICHIGAN</td><td>)</td><td></td></tr>
<tr><td>BOARD OF REGENTS,</td><td>)</td><td>OPINION</td></tr>
<tr><td>    Defendants-Appellees.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

Before: BOGGS, GRIFFIN, and NALBANDIAN, Circuit Judges.

BOGGS, Circuit Judge. Laura Beny, a female African American tenured law professor at the University of Michigan Law School, brought this employment-discrimination and retaliation action against her employer and supervisor, the University of Michigan and Dean Mark West, respectively, after she faced disciplinary action. Beny alleged race discrimination, sex discrimination, and retaliation under Title VII of the Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act. Beny also alleged a violation of the Equal Pay Act. The district court granted summary judgment in the defendants' favor on all of Beny's claims, and Beny appeals. We affirm.

## I. FACTS & BACKGROUND

### A. Factual background

In 2003, Plaintiff-Appellant Laura Beny was hired as a tenure-track assistant professor at the University of Michigan Law School. She was granted tenure in 2008 and received an endowed chair in 2019, which she still holds. Beny says that when she was hired, "she was only the second African-American female tenure-track professor hired at [the Law School] in its then nearly 150-year history."

Beny's complaint and brief describes her as "a respected advocate within the University of Michigan for the advancement and rights of women and African-American students and professors." Beny says that from 2014 to 2016, she tried to bring attention to what she saw as "inequities at the law school."

Beny did not have a disciplinary record until 2018, when she received her first disciplinary notice. Indeed, Beny states that she "was the only tenured professor to ever be disciplined by Dean West in his over 10 years as Dean."

***Events Giving Rise to Beny's First Disciplinary Notice.*** Beny received her first disciplinary notice in May 2018 for her disruptive conduct at a student-led event held in April 2018. The notice—which amounted to a warning and did not have any formal consequences—was signed by Beny; it described the relevant events as follows: during the Young Junior Scholars' Conference, an international academic conference, Beny, who was not a scheduled speaker, shouted "Mark! Are you going to take questions?" at West after he made introductory remarks. West declined the invitation and left the room. Beny then approached the podium and "demanded to speak or simply began speaking," presenting herself as a tenured professor. She then "implied . . . that the Law School intentionally sabotaged one of [her] classes because it made an

error in the exam instructions during the registration period." Soon after, one of the panelists stood up to leave, and Beny "accused [them] of leaving to call the police, and . . . repeatedly challenged [them] to call [the police.]" Beny's tone was "intimidating," and she raised her voice to a "near shout."

After unspecified audience members tried to tell Beny that the conference "was not the right forum to raise [her] concerns," she "defiantly continued to interrupt the conference," describing herself as an "American citizen" and "Michigan taxpayer" who had a right to speak. Among other things, Beny admonished one of the student-organizers who tried to interrupt her: Beny asked where the student was from, and when the student said "Israel," she remarked that "the student had time to wait for [Beny] to finish."

The "participants [in the conference] were shocked and shaken" by Beny's "lengthy and unprofessional outburst," and the notice explained that the behavior had "a negative effect on the overall success of the conference and reflected poorly on the Law School." A written account of the incident, penned by some members of the Young Scholars' Conference shortly after the incident, remarked that Beny not only ruined their event but made them "feel not really part of the Law School's community."

While the first notice did not result in any formal consequences, it mentioned that the incident giving rise to the notice would be considered when determining sanctions for any future misconduct. The notice explained that such future discipline could include "monetary penalties" and "dismissal in accordance with the appropriate procedures."

Beny does not meaningfully dispute the University's account of the incident, but she says that she disrupted the event because "she was asked to do so by one of her students who advised . . .

Beny that the conference planning violated the University's core principles of equity, diversity and inclusion."

***Events Giving Rise to Beny's Second Disciplinary Notice.*** In February 2019, Beny received a second disciplinary notice, based on her verbal abuse of West's assistant, Robyn Grimes, an African American female, in October 2018. In her brief, Beny vaguely disputes the nature of the interaction between her and Grimes. However, Beny refused to provide West any details about the incident in a meeting following the incident. And Beny conceded to the trial court that "she may have asked [Grimes] whether she had a soul" and emailed Grimes the morning after the interaction to apologize.

The second disciplinary notice imposed a modest sanction: it pushed back Beny's eligibility for sabbaticals by one year. As with the first notice, this notice stated that the October incident could be considered when determining appropriate sanctions for future misconduct.

***Events following the Second Notice.*** In fall 2021, Beny made "several informal complaints with law school administrators." As described by the district court:

> In one instance, she reported to administrators that she felt singled out by an email from Associate Dean for Academic Programming Kristina Daugirdas asking her to keep her mask on in class as part of the COVID protocol. . . . That semester, Beny also filed a complaint with the University Equity Civil Rights and Title IX (ECRT) office, citing discrimination because she was not asked to teach in one of the law school's summer programs. [Beny] says that the complaint also included allegations against West and Professor Adam Pritchard that went beyond the summer program. As she reviewed her files in preparation for her interview with the equity office, she re-encountered . . . old emails from West.

Beny describes those old emails from West, which trace back to around 2008, as "insensitive, inappropriate, sexist and racist." And the district court recounted the email exchanges between West and Beny as follows:

4

> The first . . . occurred on May 22, 2008, when West emailed her after a social gathering to remark that it was nice seeing her there. Beny responded that she was "honored" by West's presence and noted that the party "totally fell apart" after he left such that her brother almost had to "save the situation with some Air Force strategic tactics." West responded, "Oh be quiet. I really have missed you and our stupid emails. I wasn't sure how to break the silent impasse. It will be good to have you back. I liked meeting your brother, too. I almost broke his neck just to prove that I could do it, but I held back."

> In early 2010, West told Beny in an email that he was going to put a picture of her infant daughter on his desk and tell everyone the child was his. In late 2010, West emailed her to report that the Law School's communications office was "all over [his] ass" to cajole her to sit for a photo shoot due to her "beauty"; he signed the email, "Your humble minion, Mark XOXOXO." Beny responded, "If I am fucking beautiful, then why does everyone fuck with me! Anyway, I'm getting a picture in early Jan b/c that threat is scary!:- *" West replied, "Cool. Just get with lisa ASAP so she'll stop bothering me. And watch your fucking language!!"

***Events Giving Rise to Beny's Third Disciplinary Notice.*** The third disciplinary notice was sent to Beny on March 31, 2022, and the sanctions imposed within the notice are the subject of this lawsuit. The several incidents that triggered the notice are set out below.

In January 2022, the Law School's Dean of Students received an anonymous student complaint about Beny's Enterprise Organization (EO) course. The complaint mentioned concerns about Beny's preparedness and tardiness to class. Coinciding with that student complaint, Beny began to use the faculty listserv intended for official Law School business to send various emails to faculty. These emails, according to the University, created "an intimidating, hostile, offensive, and abusive environment." The third disciplinary notice contains a detailed list of the emails sent to the listserv; they are too numerous to copy here. Some of the relevant emails are as follows:

- A 1/22/22 email sent to all Law School faculty members that contained a copy of the late 2010 email sent by West to Beny, described above,[1] with the text, "Hi. If this is how your so-called boss spoke to you, how would you

---

[1] This is the email that West sent to Beny that stated that the Law School's communications office was "all over [his] ass" to cajole her to sit for a photo shoot due to her "beauty."

feel? Hmmmm. At the time that I received that email, I was a Mom to a one year old without a nanny and any relatives in the city or state."

- A 1/22/22 email sent to all Law School faculty members that read, "PS. If you don't have the courage to comment publicly, you are not an ally of anyone but yourself."

On February 9, 2022, Associate Dean for Academic Programming Kristina Daugirdas emailed Beny to set up a meeting with her and Chief Operating Officer Michele Wing to discuss the student complaint. Beny responded that she would not meet with them while her internal Title IX complaint was pending. Daugirdas replied that the meeting was mandatory, but Beny maintained that she would not meet. Beny then wrote to administrators, "[I]f you continue to push me, I will have to go very public with some of the conduct of the members of this admin toward me that has had an extremely negative impact on the environment here. It will be very embarrassing for this law school, to say the least."

On February 14, 2022, Beny addressed the anonymous student complaint with her class. Beny told the students that she welcomed constructive criticism but, among other things, implored them not to spread "malicious lies." Following another student complaint sent to Daugirdas detailing that students felt uncomfortable with Beny's response to the first complaint, Daugirdas communicated to Beny that administrators would conduct a midterm evaluation of her course and directed Beny "to teach on time and in person and to refrain from any acts that could be considered retaliatory."

The next day, on February 15, 2022, Beny withdrew from her job responsibilities, writing to her students: "I am unable to teach at this law school anymore while subjected to arbitrary abuse and retaliation. I love each of you for what you bring to the world. . . . I have not resigned but the

administration has taken over my teaching and pedagogical decisions." Soon after, Beny also reneged on her commitment to serve on the dissertation committees of two graduate students.

When Daugirdas learned of Beny's email to the students, she contacted Beny to confirm that she had indeed sent the communication to her students. "Copying several additional administrators, Beny responded that she 'decided not to continue teaching under your continued racism and retaliation' and requested that Daugirdas refrain from contacting her directly." Beny then emailed Daugirdas, West, and Wing complaining about Daugirdas's concerns about her course and adding that "evil is often sloppy." After Beny retained counsel, she met with administrators on February 25.

Meanwhile, Beny began to send dozens of personal attacks to individual members of the Law School faculty, some of which resulted in faculty to recommend that "law enforcement be enlisted to conduct a threat assessment." On February 24, 2022, for example, Professor Alicia Davis, who is African American, reported to West that Beny telephoned her. Describing the call as "incredibly disturbing," Davis reported that Beny said to her, among other things, "what evil, Satanic motive drives you?" Following the call, Beny texted Davis, "God will deal with you."

Beny also threatened the faculty member who was serving as the replacement instructor for her EO course. On February 25 she emailed the replacement instructor, "If you don't give me access to the course materials I created, you will be dragged into my lawyers [*sic*] investigation and EEOC complaint." In another email, she accused the replacement instructor of being a "racist" and a "coward" because he reported her earlier threat to administrators. Likewise, Beny sent several emails to Professor Nick Bagley, husband of Associate Dean Daugirdas. In those emails, sent in late February 2022, Beny accused Bagley of racism and, among other things, remarked that it was "bizarre" that he and his wife were hired by the Law School.

7

On February 27, 2022, Beny filed with the University's "Work Connections" office[2] an online claim for medical leave, citing a work-related psychological injury. The district court explained that Beny "believed she was applying for leave under the Family Medical Leave Act, [but] she actually had filled out paperwork for a workers' compensation claim." The form email confirming receipt of Beny's report, sent to Beny on February 27, appears to be automated; the email stated that her "supervisor" was copied on the email "as confirmation," but the email does not include any specific information about the nature of Beny's claim, and Beny's supervisors do not appear to have in fact been copied on the email.

On March 31, 2022, West issued Beny her third notice of disciplinary action. The lengthy notice detailed the above incidents and communications. It set out three specific issues with Beny's performance: 1) her "willful refusal to perform [her] duties as a tenured professor"; 2) "[her] retaliation against students in her [EO] class"; and 3) "[her] continued harassment of colleagues."

Beyond citing the abandonment of her class and discussing the above-described "retaliation" and "harassment" of her colleagues, the notice stated that Beny failed to attend and evaluate other professors' courses that she was assigned to review as a member of the Academic Standards and Practice Committee. The notice also highlighted that Beny is "the only tenured faculty member not on leave who has not attended a single faculty meeting or job talk" during the academic year.

As a sanction, Beny's pay was frozen in place through June 30, 2027, meaning that she would keep her salary, but not receive any scheduled increases. Beny was also rendered ineligible for summer funding, some other funding sources, and sabbaticals. The letter explained that Beny's

---

[2] The University's Work Connections office is "responsible for administering the University's Workers' Compensation program and is designed to help with illnesses and injuries—whether they occur on the job or not."

salary would not return to that of her cohort, and it requested that Beny prepare a detailed plan for returning to her responsibilities as a faculty member.

On April 8, 2022, Beny "clarified with the University's Work Connections office that she had intended to apply for FMLA leave." Indeed, the top of Beny's claim form contains a note from Beny: "the law school admin. was made aware of my application for workers comp (which I cancelled and changed to FMLA)[.]" Beny's FMLA leave was approved on April 15, 2022, for the period between February 15, 2022, and May 15, 2022. Thus, for that period, Beny's "use of paid or unpaid time" was not affected by her absence, and, upon her return, Beny would be "placed in the same position [she] had before the absence started or an equivalent position." West estimated that he learned of the University's approval of Beny's FMLA leave around early April. An email was sent to Wing on April 15 stating that "[s]ufficient medical documentation has been received that confirms Laura Beny's inability to work as of 2/15/2022 due to a medical condition."

## B. Procedural background

In May 2022, Beny filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging discrimination and retaliation on the basis of race, gender, and disability. She received a right-to-sue letter from the EEOC on May 31, 2022.

Right-to-sue letter in hand, Beny filed her complaint on August 26, 2022. Beny's operative complaint pleaded claims under Title VII of the Civil Rights Act of 1968 and Michigan's Elliott-Larsen Civil Rights Act (ELCRA) for sex and race discrimination (Counts I and III), retaliation in violation of the same statutes (Counts II and IV), and an Equal Pay Act claim against the University of Michigan (Count V).[3]

---

[3] The Title VII claims were pleaded against the University of Michigan only, while the ELCRA claims are pleaded against defendant Mark West only.

After the close of discovery, the defendants moved for summary judgment on Beny's claims. The district court granted the defendants summary judgment in its July 2024 Opinion. This timely appeal followed.

## II.      STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986).

We draw all reasonable inferences in Beny's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Conclusory allegations, however, are not evidence and will not, by themselves, permit [Beny] to survive summary judgment." *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 603 (6th Cir. 2022). Thus, the critical question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.      ANALYSIS

Beny's discrimination and retaliation claims rest on circumstantial evidence, so we apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Chen*, 580 F.3d at 400 (discrimination); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2024) (retaliation). Within this framework, "the plaintiff must first establish a prima facie case of discrimination; if the plaintiff does that, the employer must identify a legitimate,

nondiscriminatory reason for the adverse employment action; and if the employer does that, the plaintiff must prove that the employer's reason is a mere pretext for discrimination." *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 209 (6th Cir. 2021). "[O]n a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390–91 (6th Cir. 2009) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).

## A. Prima Facie Case

To make out a prima facie discrimination case under Title VII or ELCRA, "a plaintiff must show that she was (1) a member of the protected class, (2) subject to an adverse employment action, (3) qualified for the job, and (4) treated differently than similarly situated . . . employees for the same or similar conduct." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

The first three elements are not in dispute, but the parties clash over the fourth element—whether Beny has demonstrated that a similarly situated, nonprotected person was treated more favorably by the University. *See Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018). To satisfy the similarly situated requirement, a plaintiff must establish that the proffered "comparable employee is similar 'in all of the *relevant* aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

Relevant factors include whether the plaintiff and the Title VII comparator: (1) share the same supervisor; (2) are subject to the same standards; and (3) engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (internal quotation marks omitted). For a plaintiff and comparator to be considered to have been engaged in the same

11

conduct, the conduct generally must be similar in kind and severity. *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002).

The district court determined that Beny put forward an adequate comparator in Professor Mathias Reimann, a white male professor who also reports to West. The district court explained that Reimann "behaved in a hostile manner to . . . female Administrative Assistants," but he was not disciplined "even though officials were aware of at least some of his conduct."

The University argues that Reimann is not a Title VII comparator because there are significant "differentiating" circumstances that distinguish his conduct and the University's treatment of him for it. *See Ercegovich*, 154 F.3d at 352. For instance, Reimann had no disciplinary history when the University learned of his inappropriate behavior. This difference, the defendants argue, distinguishes Reimann from Beny, who had received two previous disciplinary notices before the punishment at issue here. *See, e.g.*, *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303–04 (6th Cir. 2016) (suggesting that differences in "disciplinary history" could establish that a supposed comparator is *not* similarly situated to the plaintiff). Setting aside the difference in disciplinary history between Beny and Reimann, the University also argues that Beny's withdrawal from her teaching duties differentiates her from Reimann; indeed, Beny's students, rather than other faculty or staff, suffered from much of Beny's conduct, as described above. *See Clayton*, 281 F.3d at 612 (affirming summary judgment in the employer's favor where proffered Title VII comparators had engaged in the same negligent acts but caused less harm than the plaintiff).

While the University's arguments on this point hold some persuasive force, we need not address them. Even assuming arguendo that Beny made out a prima facie case, her discrimination claims still fail "because she has failed to create a genuine issue of material fact as to pretext." *Chen*, 580 F.3d at 402. Thus, the following pretext analysis assumes, without deciding, that Beny

established a prima facie case of discrimination. *See ibid.*; *see also Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (assuming that the plaintiff met her initial burden by establishing a prima facie case for her Title VII discrimination claim).

Likewise, while "[t]he prima facie elements of a retaliation claim are similar but distinct from those of a discrimination claim," the analysis below also assumes without deciding that Beny made out a prima facie retaliation case. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007); *see also Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 619 (6th Cir. 2012) (skipping analysis of whether the plaintiff had shown a prima facie case of Title VII retaliation and holding that "[e]ven assuming that [the plaintiff] made out a prima facie case of retaliation, she again has not shown that [the defendant's] non-discriminatory reason for firing her . . . was pretextual").

**B. Legitimate Non-Discriminatory Reason & Pretext**

To demonstrate pretext, Beny has the burden to produce evidence from which a reasonable jury could reject the University's explanation for why it disciplined her. The pretext analysis is the same for discrimination and retaliation claims under both Title VII and ELCRA. *See, e.g.*, *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (analyzing Title VII and ELCRA claims "under the same standard"); *see also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 (6th Cir. 2019).

The University provided a legitimate reason for the disciplinary actions set out in the third notice: "[Beny's] 'abandonment' of the classroom, retaliation against students who raised concerns about her course, and her troubling communications with other faculty and staff members."

Thus, the burden shifts back to Beny to prove pretext. Beny's primary argument on appeal is that the University's reasons for disciplining her are pretextual insofar as "Beny didn't *abandon*

her class." Rather, she was forced to withdraw from teaching because of the "severe emotional trauma she was experiencing." Indeed, Beny points out that she was ultimately approved for FMLA leave backdated to the period that the University says she "abandoned" her class. Because the University disciplined Beny for class "abandonment" when key decisionmakers knew or should have known she did not abandon her class, Beny argues, the proffered reasons for discipline are pretextual.

"Unlike the showing at the prima facie stage, the burden at the pretext stage is onerous: plaintiffs must 'demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext'" for discrimination or retaliation. *Hood v. City of Memphis Pub. Works Div.*, 2023 WL 1880399, at *6 (6th Cir. Feb. 10, 2023) (quoting *Alexander v. Ohio State U. Coll. of Soc. Work*, 429 F. App'x 481, 489 (6th Cir. 2011)). There are generally three ways for plaintiffs to show pretext: by showing that 1) the proffered reasons had no basis in fact; 2) the proffered reasons did not actually motivate the employer's actions; or 3) the proffered reasons were insufficient to motivate the employer's action. *Chen*, 580 F.3d at 400. The ultimate inquiry in assessing any of these approaches is whether the "employer made up its stated reason" to mask intentional discrimination or retaliation. *Id.* at 400 n.4; *see Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

A court should enter summary judgment for an employer where no reasonable jury could find that the employer's reason for an adverse action is pretextual. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012). Under the honest-belief rule, applied by the district court and briefed by both parties, summary judgment is also proper when it would be clear to a jury that "the employer ha[d] an honest belief in its proffered nondiscriminatory [or nonretaliatory] reason" for

14

its adverse action, even when the employer's reason for its action is later proven false. *Michael*, 496 F.3d at 598.

The honest-belief rule precludes a finding of pretext on this record—Beny's argument fails because a jury could not reasonably conclude that West and other key decisionmakers did not honestly believe in the proffered reasons for disciplining Beny. *See Chen*, 580 F.3d at 400.

"When an employer *reasonably and honestly relies* on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Id.* at 401 (emphasis added and internal quotation marks omitted). Perhaps it would be "mistaken, foolish, . . . or baseless," *ibid.*, for the University to cite class abandonment as a reason for disciplining Beny if she was forced to withdraw from her duties due to a health crisis. But under the "honest-belief" doctrine, a pretext determination does not hinge on whether rule or policy violations, in fact, occurred as described (*i.e.*, whether Beny, in fact, abandoned her class) but on whether West and other decisionmakers reasonably and honestly believed that Beny abandoned her class (*i.e.*, whether they honestly believed in their nondiscriminatory or nonretaliatory reason for disciplining Beny). *See ibid.* Said another way, the University and West are protected by the honest-belief rule if the decisionmakers genuinely believed that Beny abandoned her class when they disciplined her.

A plaintiff-employee can undercut an employer's use of the honest-belief doctrine "[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (internal citation omitted). Likewise, we have explained that a plaintiff-employee may undermine an employer's honest-belief argument by producing evidence "that an

error by the employer was 'too obvious to be unintentional.'" *Tingle*, 692 F.3d at 531 (internal citation omitted). But the employee "must allege more than a dispute over the facts" upon which her discipline was based. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). And "we do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Beny argues that West "put his head in the sand" and knew—or should have known—that Beny "had filed a disability claim on February 27, 2022, retroactive to the February 15, 2022, date of alleged abandonment." Thus, Beny contends, it cannot be that West and other decisionmakers reasonably and honestly relied on Beny's abandonment of her class in making the decision to discipline her.

Beny's argument is unconvincing because the honest-belief rule considers only "the particularized facts that were before [the employer] at the time the [disciplinary] decision was made." *Escher v. BWXT Y–12*, 627 F.3d 1020, 1030 (6th Cir. 2010) (internal citation omitted). And there is no evidence in the record to suggest that West and others doubted that Beny "abandoned" her class when she was issued the disciplinary notice. That is, nothing in the record suggests that any relevant decisionmakers knew about Beny's leave application or that it was FMLA related; so they did not know that the third notice's characterization of Beny having "abandoned" her class was contestable.

The administrators' testimony that each was unaware of Beny's request for FMLA leave makes perfect sense: none of Beny's emails sent to administrators or students during the time period at issue suggest that Beny was applying for FMLA leave; the confirmation emails sent to Beny after she applied for workers compensation were not, in fact, copied to the relevant administrators; there is no evidence that Beny mentioned any type of leave during her and her

16

attorney's February 25 meeting with administrators, including West; and there is no evidence that West and other key Law School administrators were in communication with the University office that handles FMLA leave, seemingly until sometime in April, after the issuance of the third notice.

Contrary to Beny's argument, West and other administrators did make a "reasonably informed and considered" decision before disciplining Beny. *See Wright*, 455 F.3d at 708. Again, to make a reasonably informed decision and secure the protection of the honest-belief rule, the employer must identify "particularized facts upon which it reasonably relied." *Tingle*, 692 F.3d at 531. The detailed nature of the third notice bears out that decisionmakers reasonably relied on a thorough investigation—the notice chronicles Beny's past disciplinary history, dozens of disruptive texts and emails sent to faculty, and the steps administrators took in an attempt to communicate with Beny about her conduct. *Ibid.* ("The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process.").

And as underscored by the district court, that so much of Beny's conduct was directed at decisionmakers themselves, including West and Daugirdas, obviates some of the need for an extensive investigation. *See id.* at 532. Beny cannot show that the University's decision-making process was "unworthy of credence," or that some error made in the process was "too obvious to be unintentional," so she cannot show that the University did not have an "honest belief" in the reasons provided for the discipline. *See Smith*, 155 F.3d at 807–08.

Beny's argument is also flimsy insofar as punishment of an employee on FMLA leave need not raise an inference of pretext. As recognized by the district court, while FMLA leave "may excuse [Beny] from workplace responsibilities during the months of her illness, . . . it does not excuse her from acts of misconduct that occurred during that period, and it does not undermine the defendants' administrator's honest belief in the need to issue disciplinary measures." *See Yarberry*

*v. Gregg Appliances, Inc.*, 625 F. App'x 729, 739–40 (6th Cir. 2015) ("[W]here there has been employee misconduct—including nonviolent disruptive misconduct—the employer may terminate the employee for that behavior, even if it is related to his disability."). And most of the misconduct cited by the third notice as reasons for Beny's discipline is undisputed: that she failed to attend faculty meetings; that she sent disruptive, sometimes threatening, texts and emails to faculty; and that she previously received two other disciplinary notices, both of which warned her of consequences for future misdeeds.

Finally, Beny argues that the content of West's inappropriate emails and Beny's public airing those emails in or around January 2022, in part through the law school faculty listserv—as described above—tend to show that the reasons given by the University to discipline her are pretext for illegal discrimination. Beny likely forfeited this argument because it was not "squarely presented" to the district court. *See Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1172 (6th Cir. 1996).

In any event, Beny's argument on this point is unpersuasive. Beny relies primarily on *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 653–54 (6th Cir. 2015), to suggest that West's emails undercut his honest belief in the reasons provided for disciplining Beny. But *Yazdian* is inapposite. There, we held that an employer was not protected by the honest-belief rule where a company "blindly followed" a direct manager's recommendation to terminate the plaintiff. *Id.* at 654. That is, the company did not conduct *any* investigation into the direct manager's "stated reason for the decision to terminate [the plaintiff]," *ibid.*, and so it could not claim protection of an honest belief.

Beny does not dispute that West, Daugirdas, Wing, and other University representatives all participated in discussions about Beny's conduct and the ultimate decision to issue the third

18

notice. While Beny is correct to characterize West as a key decisionmaker in the disciplinary process, the investigation into Beny's conduct was thorough and involved many parties, as explained above. And ultimately, while West's emails are objectionable, Beny does not establish a nexus between the emails and the disciplinary actions made against her such that a reasonable jury could determine that discrimination or retaliation somehow motivated the discipline.

At bottom, Beny presents no evidence from which a jury could reasonably reject the University's explanation for the discipline and infer that "the defendants . . . did not honestly believe in the proffered nondiscriminatory [and nonretaliatory] reason[s] for its adverse employment action." *Tingle*, 692 F.3d at 531.[4]

Beny's inability to show pretext means that her discrimination and retaliation claims under both Title VII and ELCRA must fail.[5] *See, e.g.*, *Shefferly v. Health All. Plan of Mich.*, 94 F. App'x 275, 282–83, 285 (6th Cir. 2004).

### C. Equal Pay Act Claim

Beny's Equal Pay Act claim fails for much the same reasons. Indeed, Title VII, ELCRA, and Equal Pay Act claims often rise and fall together, at least where they are based on the same set of facts. *See, e.g.*, *Mallison v. Haworth, Inc.*, 488 F. App'x 88, 94 (6th Cir. 2012) ("Because

---

[4] Beny also objects to how the University has characterized her actions. For instance, Beny challenges the facts within the anonymous student complaint mentioned in the third notice. But as the district court explained, "a case alleging unlawful [discrimination] is not a vehicle for litigating the accuracy of the employer's grounds for [discipline]." *Tingle*, 692 F.3d at 530.

[5] Beny also tries to establish pretext by arguing at length that the University "violated [its] procedures by denying [her] . . . a proper hearing as mandated by Regents Bylaw 5.09," the University's dismissal and demotion policy. It is unsurprising that the district court's thorough opinion says nothing about Beny's Bylaw-related argument because Beny did not make the argument below, as the University presses. Because Beny did not present the Bylaw-related argument to the district court, it is forfeited and we do not address it. *See Thurman*, 90 F.3d at 1172.

we conclude that the district court correctly dismissed Mallison's [Equal Pay Act] claim, we also affirm its dismissal of Mallison's Title VII and ELCRA causes of action.").

"The Equal Pay Act prohibits employers from discriminating against an employee on the basis of sex by paying lower wages . . . for performing equal work, 'except where such payment is made pursuant to: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021) (quoting 29 U.S.C § 206(d)(1)). The fourth exception, a "catch-all" relied upon by the University, allows a "'factor other than sex' to be an affirmative defense only if, 'at a minimum, [it] was adopted for a legitimate business reason.'" *Id.* at 508 (internal citation omitted). If a defendant meets its burden of showing a legitimate business reason, the plaintiff must then "produce evidence creating a triable issue of fact as to whether the defendant's proffered explanation was pretextual." *Ibid*.

To make out her Equal Pay Act claim, Beny presented as a comparator Professor John Pottow, a male member of the faculty whose pay she argues should have moved in lockstep with her own. The University concedes that Beny and Pottow receive different salaries, but the University argues, in part, that the pay disparity stems from Beny's discipline. Indeed, as explained above, the third notice states that, as a sanction for Beny's actions, her pay would be frozen through June 30, 2027.

Beny briefly argues, in a conclusory fashion, that the district court erred by granting summary judgment in the defendants' favor on Beny's Equal Pay Act claim because "there is a disputed issue of fact, based on the testimony of Dean West" regarding whether Beny was disciplined for her abandonment and other conduct on bases "other than sex."

Again, however, Beny has not created a triable issue on pretext. Beny mentions that the district court misapplied the applicable Equal Pay Act standard, noting that "a defendant bears both the burden of persuasion and production on its affirmative defenses." *See Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 753 (6th Cir. 2016) (citation omitted). Beny is correct that, as the party who bears the burden of persuasion, the University is required to "demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." *Ibid.* And, because she is the plaintiff, Beny "bears the burden of producing evidence of pretext solely where a reasonable jury viewing the defendant's evidence could find only for the defendant." *Ibid.* But the district court's opinion recognized and properly applied that standard.

Nothing in the record undermines the University's proposed connection between Beny's performance issues and her pay or creates an issue of material fact as to whether Beny's pay freeze was motivated by her sex.

## IV.     CONCLUSION

For these reasons, we AFFIRM.